IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

FILED BY CLERK

DEC 15 2009

COURT OF APPEALS
DIVISION TWO

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | |
| | ) | 2 CA-CR 2008-0315 |
| Plaintiff/Appellant, | ) | 2 CA-SA 2009-0020 |
| | ) | (Consolidated) |
| v. | ) | DEPARTMENT A |
| | ) | |
| EDWARD CHARLES NOCEO, | ) | O P I N I O N |
| | ) | |
| Defendant/Appellee. | ) | |
| | ) | |
| | ) | |
| MICHAEL HARRIS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HON. HOWARD FELL, Judge Pro | ) | |
| Tempore of the Superior Court of the | ) | |
| State of Arizona, in and for the County of | ) | |
| Pima, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE STATE OF ARIZONA, | ) | |
| | ) | |
| Real Party in Interest. | ) | |
| | ) | |

APPEAL AND SPECIAL ACTION PROCEEDING
FROM THE SUPERIOR COURT OF PIMA COUNTY

Cause Nos. CR-20073381 and CR-20084006

Honorable Richard S. Fields, Judge
Honorable Howard Fell, Judge Pro Tempore

Barbara LaWall, Pima County Attorney
  By Jacob R. Lines                                                        Tucson
                                            Attorneys for Plaintiff/Appellee/
                                                       Real Party in Interest


Law Offices of Henry Jacobs
  By Henry Jacobs and Thomas Jacobs                                        Tucson
                                               Attorneys for Appellee Noceo
                                                      and Petitioner Harris

E S P I N O S A, Presiding Judge.

¶1        In the summer of 2007, appellee Edward Noceo and petitioner Michael Harris were separately arrested and charged with driving under the influence of an intoxicant (DUI). Both had samples of their blood drawn by law enforcement officers at the scene of their arrests, and both subsequently moved to prevent admission of the blood test results at trial, asserting that the procedures used to draw their blood were unconstitutional.

¶2        Noceo's motion was granted, and the state appeals from the superior court's order precluding the introduction of blood-alcohol evidence at trial. Harris's motion was denied, he was convicted after trial in Tucson city court, and his conviction was affirmed by the superior court on appeal. Having no right of appeal from the superior court's ruling, Harris has petitioned this court for special action relief. Because the legal issues presented in the two cases are substantially identical, we have ordered them consolidated. We now

2

address Noceo's appeal and accept jurisdiction of Harris's petition for special action because our trial courts' inconsistent applications of case law concerning the constitutionality of blood-draw evidence are a matter of statewide importance. *See State ex rel. Pennartz v. Olcavage*, 200 Ariz. 582, ¶ 10, 30 P.3d 649, 652 (App. 2001) (special action jurisdiction appropriate to resolve issues of statewide importance on which courts are divided).

### Factual and Procedural Background

¶3 The only relevant facts are those relating to the two blood draws. *See Schmerber v. California*, 384 U.S. 757, 771-72 (1966) (constitutionality of blood draw turns on specific facts); *State v. May*, 210 Ariz. 452, ¶ 9, 112 P.3d 39, 42 (App. 2005) (examining circumstances of individual blood draw to determine constitutionality); *see also Ove v. Gwinn*, 264 F.3d 817, 824 (9th Cir. 2001) ("To allege a constitutional violation, plaintiffs needed to assert that their blood tests were unreasonable and not taken in accordance with medical practices."). We review a trial court's ruling on a motion to suppress evidence for an abuse of discretion, considering only the evidence presented at the suppression hearing. We defer to the court's findings of fact unless they are clearly erroneous, but we review questions of law de novo. *May*, 210 Ariz. 452, ¶ 4, 112 P.3d at 41. An error of law constitutes an abuse of discretion. *State v. Campoy*, 220 Ariz. 539, ¶ 37, 207 P.3d 792, 804 (App. 2009).

¶4 After being arrested for DUI in August 2007, Noceo consented to a blood draw at the scene. Department of Public Safety (DPS) Officer Palmer, who was also a qualified

3

phlebotomist, placed him in the back seat of his patrol car. Before drawing Noceo's blood, Palmer put on latex gloves and cleaned Noceo's arm with iodine. Because lighting was poor, the officer turned on the dome light in his vehicle and asked another officer to assist him by shining a flashlight on Noceo's arm. Palmer then successfully drew Noceo's blood on his first attempt. Noceo fell asleep during the procedure.

¶5        After Harris's July 2007 arrest for DUI, he, too consented to a blood draw at the location where he was stopped. Like Noceo, Harris was seated in a patrol car while a sheriff's deputy, who was also a trained phlebotomist, drew his blood. As in Noceo's case, the blood draw was successful and was completed without incident.

**Discussion**

**Noceo**

¶6        The state contends the trial court erred in suppressing Noceo's blood evidence for perceived flaws in DPS's phlebotomy program.[1] Citing *Schmerber*, *May*, and *Ove*, the state argues that precluding blood-draw evidence requires the blood draw have been performed in an unreasonable manner, which, it maintains, did not happen here. Noceo responds that the trial court properly suppressed the blood evidence because it was collected in violation of the Fourth Amendment. According to Noceo, *Schmerber* provides that a

---

[1]DPS trains officers in a "Law Enforcement Phlebotomy Program," whose participants receive instruction and must complete one hundred successful blood draws to become qualified phlebotomists. The DPS phlebotomists receive ongoing annual training and performance reviews. DPS employs a phlebotomy coordinator and has produced a manual detailing the program's protocol. DPS phlebotomists conduct blood draws in the field for their own cases and also for other agencies.

4

blood draw performed in a nonmedical setting by a "minimally qualified police officer is substantially beyond the scope of the Fourth Amendment."

¶7        But Noceo's reading of *Schmerber* is at odds with our decision in *May*, which both the state and Noceo cited below but the trial court apparently overlooked in making its ruling. We held in *May* that allowing a properly qualified police officer to draw blood during a DUI arrest does not violate the Fourth Amendment.[2] 210 Ariz. 452, ¶¶ 3, 9-10, 112 P.3d at 41-42. There, a police phlebotomist drew May's blood while he stood at the rear of the officer's car, with his arm resting on the car's trunk. *Id*. ¶ 7. In the trial court, an expert witness opined that standing blood draws increase the risk of injury and violate the applicable standard of care. *Id*. The trial court nonetheless found the blood draw reasonable because the procedure "resulted in only a 'slightly higher' risk of complications 'in a field setting' than those of a clinical setting." *Id*. ¶ 8. On review, we found no constitutional or statutory basis to disturb the trial court's ruling, noting that the training the officer had received and his experience in having previously "drawn blood 150 to 200 times," *id*. ¶ 10, ensured that the procedure was reasonable. *Id*. ¶¶ 9-10.

---

[2]Although Noceo argues Officer Palmer was not qualified to draw blood under A.R.S. § 28-1388, the record reflects that this officer's training and experience is on par with that of the officer in *May*, who we determined was properly found qualified for purposes of this statute. 210 Ariz. 452, ¶ 10, 112 P.3d at 42.

**¶8**        Here, we are presented with facts nearly identical to those in *May*,[3] yet the trial court suppressed the evidence based on its findings regarding the phlebotomy program as a whole rather than the circumstances of Noceo's blood draw in particular. The fundamental question with respect to compelled blood draws and the Fourth Amendment, however, is not whether the blood draw program as a whole is reasonable—a question our state legislature implicitly has answered in A.R.S. §§ 28-1321 and 28-1388—but rather, "whether the means and procedures employed in taking [a suspect's] blood respected relevant Fourth Amendment standards of reasonableness." *Schmerber*, 384 U.S. at 768. Thus, the trial court erred as a matter of law by evaluating the entire DPS phlebotomy program instead of the reasonableness of Noceo's particular blood draw. As a result, it abused its discretion.

**¶9**        Moreover, even if the trial court's evaluation of the DPS phlebotomy program had been appropriate, the court's findings do not appear to be supported by the record. *See State v. Childress*, 222 Ariz. 334, ¶ 9, 214 P.3d 422, 426 (App. 2009) ("An abuse of discretion occurs when the reasons given by the court for its decision are clearly untenable, legally incorrect, or amount to a denial of justice."). First, the court found "[t]he DPS phlebotomy program and manual lacked appropriate medical oversight when originated." But the former director of the DPS program and author of the first program manual testified that he previously had worked as a hospital corpsman with the United States Navy and had

---

[3]In fact, Noceo's blood draw appears to have been even more reasonable than that conducted in *May*. As noted above, *May* involved an arguably more dangerous standing blood draw whereas Noceo was seated in a patrol car.

6

been an emergency medical technician, a nurse's assistant, and a field medic with the United States Marine Corps. In addition, he testified that the first director of the DPS phlebotomy program was a medical doctor, who had reviewed the manual and had overseen the entire program at its inception. Although Noceo's expert witness was critical of the program, Noceo failed to present any evidence that the program and manual had lacked medical oversight at their creation.

¶10 The court also found that blood draws conducted in poor lighting, under less than sanitary conditions, and "often-times in violation of protocol" create an unreasonable risk of infection and injury. But even Noceo's expert did not testify that poor lighting conditions rendered a blood draw unacceptable. Rather, he testified, "I don't think they would be optimal conditions, and you'd like to avoid them if possible." Officer Palmer testified that lighting conditions had never caused problems with any blood draws he had performed. Nor did Noceo's expert comment on hygienic conditions attending blood draws under the DPS program, although Palmer testified about his own use of protective gloves and his attention to cleaning and disinfecting the venipuncture site. The "violation of protocol" to which the court refers is unclear, but it may relate to Officer Palmer's testimony that on occasion he had conducted blood draws while a subject leaned over a stationary object despite departmental protocol which forbade standing blood draws.[4] However, as noted

_____

[4]Noceo's expert also testified generally that the phlebotomy program consists of "people who are totally incompetent, who are certified by their agencies to be drawing blood. There are people who just aren't following protocol." But he admitted this opinion was

7

earlier, a standing blood draw was at issue in *May*, and we determined that any additional risk inherent in that procedure was not so unreasonable that it offended the Constitution. 210 Ariz. 452, ¶¶ 7-9, 112 P.3d at 41-42.

¶11 The trial court next found that "[t]he lack of any realistic mechanism to evaluate continued proficiency . . . endangers the health of suspects whose blood is drawn roadside," and the lack of "individual performance appraisals" violates *Schmerber*. These conclusions, however, find little support in either *Schmerber* or the evidence. *Schmerber* did not set forth standards for evaluating proficiency or appraising individual performance. *See May*, 210 Ariz. 452, ¶ 6, 112 P.3d at 41 ("*Schmerber* 'did not attempt to set any specific rules for blood tests conducted outside the hospital setting.'"), *quoting People v. Esayian*, 5 Cal. Rptr. 3d 542, 549 (Cal. Ct. App. 2003). And the state's witnesses testified that officers are required to participate in regular training courses to update their skills. Periodically, phlebotomy instructors evaluate the officers' performance in the field as well. Moreover, DPS requires phlebotomists to document their blood draws and to report any complications or problems. Additionally, departmental protocols are regularly reviewed and revised in light of changes in the law and in technology. Even Noceo's expert admitted that the program contains oversight procedures, albeit ones he did not find adequate. Accordingly, we conclude the trial court made erroneous findings not supported by the evidence. *See Childress*, 222 Ariz. 334, ¶ 9, 214 P.3d at 426.

---

based on other cases in which he had testified and did not relate to Officer Palmer or any alleged incompetence or failure to follow protocol in Noceo's case.

¶12     Furthermore, even were they relevant, the trial court's generalized legal conclusions regarding the DPS phlebotomy program are inconsistent with established case law. In determining the program was so unreasonable as to render it unconstitutional, the court found the "program and manual lacked appropriate medical oversight," "[b]lood draws carried out in roadside situations . . . subject the suspects . . . to an unreasonable risk of infection and injury," current practices lack appropriate oversight in violation of *Schmerber*, and the availability of alternative means of testing blood alcohol render roadside blood draws unconstitutional. But we noted in *May* that "'[t]he test for lawful searches and seizures is the unreasonableness of the search under the circumstances,'" 210 Ariz. 452, ¶ 6, 112 P.3d at 41, *quoting State v. Hutton*, 108 Ariz. 504, 507, 502 P.2d 1323, 1326 (1972), and we held that a roadside blood draw performed in a reasonable manner by an officer who has demonstrated competency through training or experience did not run afoul of either *Schmerber* or the Constitution. 210 Ariz. 452, ¶¶ 9-10, 112 P.3d at 42. Because the trial court's ruling contradicts our holding in *May*—that a reasonably conducted roadside blood draw by a qualified officer is constitutional—it is erroneous as a matter of law.[5]

_____

[5]Noceo argues *May* is inapplicable and asserts this court "was presented with an inadequate record, and did not feature testimony from physicians." He further claims that, "upon a more complete record[, we] probably would have decided that case differently" based on the standing blood draw conducted there. These claims are perplexing. Nothing indicates the record in *May* was incomplete. Moreover, even had we found that particular standing blood draw unreasonable and unconstitutional, it would not necessarily dictate the same conclusion for the seated blood draw at issue here.

**Harris**

¶13        In contrast, the superior court that reviewed the city court's ruling properly evaluated the specific facts of Harris's blood draw before upholding the admission of the evidence. The court considered the deputy's testimony about his phlebotomy training and concluded that he was qualified to draw blood and that "the field draw conducted in this case was conducted in a reasonable manner."[6] It noted the deputy had completed a forty-hour phlebotomy course, had successfully completed one hundred blood draws under the supervision of trained medical personnel, and was required to undergo "periodic refresher training." The court also noted evidence showing that, during Harris's blood draw, the deputy used procedures similar to those used in *May*, including wearing protective gloves, cleaning and disinfecting the puncture site, using a tourniquet, and ensuring the punctured vein clotted properly. The record does not show that any theoretically increased risk associated with on-site testing rendered the blood draw in Harris's case unreasonable, and the trial court did not abuse its discretion in so ruling. *See May*, 210 Ariz. 452, ¶ 9, 112 P.3d at 42.

---

[6]The record is unclear whether the deputy who drew Harris's blood did so under the DPS program or a different law enforcement agency's phlebotomy program. This fact is not material, however, because the trial court evaluated the individual circumstances of Harris's blood draw rather than the phlebotomy program or protocols under which the deputy operated.

**Disposition**

¶**14**      For the foregoing reasons, we vacate the trial court's order granting Noceo's

motion to suppress and remand his case for further proceedings consistent with this decision.

Finding no error in Harris's case, we deny relief.

_____

PHILIP G. ESPINOSA, Presiding Judge

CONCURRING:


_____

JOSEPH W. HOWARD, Chief Judge



_____

ANN A. SCOTT TIMMER, Judge*


*The Honorable Ann A. Scott Timmer, Chief Judge of Division One of the Arizona Court
of Appeals, is authorized to participate in this appeal pursuant to A.R.S. § 12-120(F) (2003).