**Adeel SIDDIQ, Appellant**

v.

**The STATE of Texas, State**

**NO. 02-15-00095-CR**

Court of Appeals of Texas, Fort Worth.

**DELIVERED: August 31, 2016**

---

Joseph C. Boswell, Boswell Legal Group, Brent Bowen, Bowen Law Group, Denton, TX, for Adeel Siddiq.

Paul Johnson, Criminal District Attorney; Catherine Luft, Chief of Appellate Division, Assistant Criminal District Attorney; Andrea R. Simmons, Tony Paul & Jesse Davis, Assistant Criminal District Attorneys, Denton County District Attorney's Office, Denton, TX, for The State of Texas.

.PANEL: DAUPHINOT, WALKER, and MEIER, JJ.

## OPINION

SUE WALKER, JUSTICE

### I. INTRODUCTION

We address two primary issues in this appeal by Appellant Adeel Siddiq from his felony driving while intoxicated conviction.[1] First, whether an audio recording—of the phone call Siddiq placed from the Frisco jail to his father—was made illegally in violation of federal and state wiretap statutes and the Texas Penal Code. And second, whether the blood draw performed on Siddiq was not performed in a reasonable manner as required by the Fourth Amendment because it departed in certain respects from accepted medical standards. Because we hold that the law-enforcement exception applies to the recorded phone call and because we hold that the particular circumstances of Siddiq's blood draw did not render the seizure of his blood constitutionally infirm, we will affirm the trial court's judgment.

1. *See* Tex. Penal Code Ann. §§ 49.04(a), .09(b)(2) (West Supp. 2016).

2. Siddiq also told his father more than once that his life was over and that he would have to leave the United States.

## II. FACTUAL AND PROCEDURAL BACKGROUND

A City of Frisco police officer stopped Siddiq a little after 2:00 a.m. after seeing the car that Siddiq was driving swerve several times, veer and almost hit some parked cars, and hit a curb after turning too sharply at an intersection. Because Siddiq exhibited signs of possible intoxication, the officer asked him to exit the car and to perform field sobriety tests. Siddiq refused to perform any tests, stating that he wanted his lawyer present. The officer arrested Siddiq.

While a detention officer booked Siddiq into the Frisco jail, Siddiq utilized a phone located at the book-in desk to call his father. That call was automatically recorded and stored in a database. During the call, Siddiq's father asked if Siddiq was drunk, and Siddiq said, "Yeah."[2]

Siddiq refused to consent to a blood draw, so the arresting officer obtained a search warrant to take a sample of Siddiq's blood. A certified medical assistant performed the blood draw in a separate room at the jail. The results showed that Siddiq had a blood-alcohol concentration (BAC) of 0.238.

Before trial, Siddiq filed a motion to suppress the recorded phone call and verbally moved to suppress the BAC results at a pretrial hearing.[3] The trial court denied Siddiq's motion to suppress the BAC results at the pretrial hearing and denied his motion to suppress the recorded phone call at trial. The trial court overruled Siddiq's trial objections to both the recording and the BAC results and admitted both into evidence.

3. The State did not provide Siddiq's counsel with a copy of the recorded phone call until the morning of the original trial setting, so the trial court granted a one-week continuance of the trial. Siddiq subsequently filed a motion to suppress the recorded phone call.

A jury convicted Siddiq of felony driving while intoxicated and assessed his punishment at ten years' confinement, probated for ten years, and a $10,000 fine. The trial court sentenced him accordingly. Siddiq raises six points, challenging the admissibility of the recorded phone call and the BAC results and asserting that he was entitled to article 38.23(a) jury instructions concerning the legality of the phone call recording and the blood draw.

### III. ADMISSIBILITY OF RECORDED CALL AND BAC RESULTS

In his first, second, third, and fifth points, Siddiq challenges the admissibility of the recorded phone call and the BAC results.[4]

### A. Standard of Review

■ A motion to suppress is nothing more than a specialized objection to the admissibility of evidence. *Black v. State*, 362 S.W.3d 626, 633 (Tex.Crim.App.2012); *Moreno v. State*, 124 S.W.3d 339, 343 (Tex. App.—Corpus Christi 2003, no pet.). Like any ruling on the admission of evidence, a trial court's ruling on a motion to suppress is reviewed for an abuse of discretion. *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim.App.2009). Therefore, we must uphold the trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Id.* at 878–79; *see also Hereford v. State*, 339 S.W.3d 111, 117–18 (Tex. Crim.App.2011); *State v. Stevens*, 235 S.W.3d 736, 740 (Tex.Crim.App.2007); *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex.Crim.App.2003), *cert. denied*, 541 U.S.

974, 124 S.Ct. 1883, 158 L.Ed.2d 469 (2004).

■ In reviewing a trial court's ruling on a motion to suppress, we view all of the evidence in the light most favorable to the trial court's ruling. *State v. Garcia–Cantu*, 253 S.W.3d 236, 241 (Tex.Crim.App.2008). When, as in this case, the trial court does not make explicit findings of fact, we must infer the necessary findings that support the trial court's ruling if the record supports the implied findings. *Id.* We afford almost total deference to the trial court's determination of historical facts, especially when those facts are based on an evaluation of credibility and demeanor. *Id.* But we review de novo legal conclusions based on the facts. *Id.*

■ When the issues raised in suppression hearings are consensually relitigated before the jury, we consider the evidence from both in our review. *Rachal v. State*, 917 S.W.2d 799, 809 (Tex.Crim.App.), *cert. denied*, 519 U.S. 1043, 117 S.Ct. 614, 136 L.Ed.2d 539 (1996).

### B. Recorded Phone Call from Jail

#### 1. The Pertinent Statutes

Siddiq contends that the recording of his phone call to his father was made illegally in violation of the federal wiretap statute, *see* 18 U.S.C.A. §§ 2511, 2518 (West 2015), § 2516 (West Supp. 2016); the state wiretap statute, *see* Tex. Code Crim. Proc. Ann. art. 18.20 (West Supp. 2016); and the penal code, *see* Tex. Penal Code Ann. § 16.02 (West Supp. 2016)—all of which made the recorded phone call inadmissible, *see* Tex. Code Crim. Proc. Ann. art. 38.23 (West 2005).

4. Siddiq's trial objections to the admission of the recorded phone call and the BAC results included some but not all of the grounds he asserted in his motions to suppress. Siddiq's first, second, third, and fifth points limit his challenges to the admission of the recorded phone call and the BAC results to the same grounds he asserted in his motions to suppress and re-urged at trial.

The Federal Wiretap Act generally prohibits the unauthorized interception of "any wire, oral, or electronic communication." 18 U.S.C.A. § 2511(1)(a). Texas's wiretap statute generally permits the use of the contents of any intercepted communication unless the interception is made in violation of federal law, code of criminal procedure article 18.20, or penal code section 16.02. *See* Tex. Code Crim. Proc. Ann. art. 18.20, § 2(a)(1), (2). Texas Penal Code section 16.02 is titled "Unlawful Interception, Use, or Disclosure of Wire, Oral, or Electronic Communications" and prohibits the intentional interception of a "wire, oral, or electronic communication." Tex. Penal Code Ann. § 16.02(b)(1).

■ Despite the general statutory limitations on wiretaps, both the federal and the state wiretap statutes contain procedures whereby local law enforcement may obtain a judicial order authorizing the lawful interception of an electronic communication. *See* 18 U.S.C.A. §§ 2516(2), 2518; Tex. Code Crim. Proc. Ann. art. 18.20. Even in the absence of such a judicial order, however, law enforcement's interception of an electronic communication is not unlawful if it falls within the law-enforcement exception to the federal wiretap statute. *See, e.g., United States v. Van Poyck,* 77 F.3d 285, 291 (9th Cir.) (recognizing law-enforcement exception), *cert. denied,* 519 U.S. 912, 117 S.Ct. 276, 136 L.Ed.2d 199 (1996); *United States v. Sababu,* 891 F.2d 1308, 1328–29 (7th Cir.1989) (same); *United States v. Paul,* 614 F.2d 115, 117 (6th Cir.) (same), *cert. denied,* 446 U.S. 941, 100 S.Ct. 2165, 64 L.Ed.2d 796 (1980).

■ The law-enforcement exception was created by excluding—via the definitions provided in the federal and state wiretap statutes—interceptions made by a law-enforcement officer in the ordinary course of his duties. The federal statute defines "[i]ntercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C.A. § 2510(4) (West 2015). The definition of "electronic, mechanical, or other device" specifically excludes "any telephone or telegraph instrument, equipment or facility, or any component thereof, ... being used by a ... law[-]enforcement officer in the ordinary course of his duties." *Id.* § 2510(5)(a)(ii). Juxtaposing these definitions, phone calls routinely recorded by law enforcement in detention facilities in accordance with a policy do not violate the federal wiretap statute because they are not "intercept[ed]" as that term is defined in the statute. *See United States v. Lewis,* 406 F.3d 11, 16–18 (1st Cir.2005) ("In other words, the acquisition of the contents of a communication by an investigative or law[-]enforcement officer in the ordinary course of his duties is not an interception for [purposes of the federal wiretap statute].") *cert. denied,* 548 U.S. 917, 126 S.Ct. 2951, 165 L.Ed.2d 973 (2006); *see also United States v. Friedman,* 300 F.3d 111, 122–23 (2d Cir.2002), *cert. denied,* 538 U.S. 981, 123 S.Ct. 1785, 155 L.Ed.2d 672 (2003); *United States v. Hammond,* 286 F.3d 189, 192 (4th Cir.), *cert. denied,* 537 U.S. 900, 123 S.Ct. 215, 154 L.Ed.2d 172 (2002); *Amati v. City of Woodstock,* 176 F.3d 952, 955–56 (7th Cir.), *cert. denied,* 528 U.S. 985, 120 S.Ct. 445, 145 L.Ed.2d 362 (1999); *Van Poyck,* 77 F.3d at 291–92; *cf. Smith v. U.S. Dep't of Justice,* 251 F.3d 1047, 1050–51 (D.C.Cir. 2001) (holding routinely-recorded inmate call was excluded from scope of federal wiretap statute so that recorded call was subject to Freedom of Information Act request by inmate). So long as the policy results in the recording of all calls—that is, a particular call is not singled out for recording—the recording will be consid-

ered to be made in the ordinary course of a law-enforcement officer's duties. *See, e.g., Lewis*, 406 F.3d at 17–18 (holding recording all inmate calls pursuant to an established prison policy qualified as "the ordinary course of correctional officers' business within the purview" of federal wiretap law's definitions); *Van Poyck*, 77 F.3d at 291–92 ("MDC is a law[-]enforcement agency whose employees tape all outbound inmate telephone calls; interception of these calls would appear to be in the ordinary course of their duties").

■ The Texas statutes—code of criminal procedure article 18.20 and penal code section 16.02—incorporate the same definitions of "intercept" and "electronic, mechanical, or other device" as the federal statute. Tex. Code Crim. Proc. Ann. art. 18.20, § 1(3), (4) (using same definitions as federal statute); Tex. Penal Code Ann. § 16.02(a) (providing that definitions of "intercept" and "electronic, mechanical, or other device" are the same as in article 18.20). Although no Texas case exists applying the law-enforcement exception to our state's statutes,[5] because the definitions of "intercept" and "electronic, mechanical, or other device" in code of criminal procedure article 18.20 and penal code section 16.02 are identical to the definitions of those terms in the federal wiretap statute and because our statutes are patterned on the federal wiretap statute, we construe Texas's statutory provisions in accordance with federal cases interpreting identical definitional provisions of the federal statute. *See Castillo v. State*, 810 S.W.2d 180, 183 (Tex.Crim.App.1990).

■ A consent exception also exists. Both the federal and state wiretap statutes and penal code section 16.02 contain provisions that allow persons acting under color of law to intercept electronic communications if at least one of the parties to the communication consents to the recording of it. 18 U.S.C.A. § 2511(2)(c); Tex. Code Crim. Proc. Ann. art. 18.20, § 17; Tex. Penal Code Ann. § 16.02(c) (providing that consent to the recording by one of the parties constitutes an affirmative defense to prosecution). Under these statutes, a person's consent to the recording may be implied if he or she was given meaningful notice that a call was subject to monitoring or recording and nevertheless chose to make the call. *See, e.g., United States v. Faulkner*, 439 F.3d 1221, 1225 (10th Cir. 2006); *Van Poyck*, 77 F.3d at 292; *Griggs–Ryan v. Smith*, 904 F.2d 112, 116–17 (1st Cir.1990); *United States v. Amen*, 831 F.2d 373, 378–79 (2d Cir.1987), *cert. denied*, 485 U.S. 1021, 108 S.Ct. 1573, 99 L.Ed.2d 889 (1988); *Banargent v. State*, 228 S.W.3d 393, 403–04 (Tex.App.—Houston [14th Dist.] 2007, pet. ref'd); *see also Escalona v. State*, No. 05–12–01418–CR, 2014 WL 1022330, at *1, *10 (Tex.App.—Dallas Feb. 20, 2014, pet. ref'd) (mem. op., not designated for publication) (implying consent based on verbal prompt warning user that call was being recorded); *Sanchez v. State*, No. 03–03–00139–CR, 2005 WL 1536219, at *7–8 (Tex.App.—Austin June 30, 2005, no pet.) (mem. op., not designated for publication) (implying consent when recipient of outgoing call from jail heard verbal prompt warning calls could be recorded and pressed zero to continue call).

■ When evidence, including a recorded phone call, is obtained in violation of the constitutions or any laws of the

---

5. The law-enforcement exception is mentioned in *Moseley v. State*, 252 S.W.3d 398, 400 (Tex.Crim.App.2008), but the court of criminal appeals did not address it because the DVD recording of the defendant's side of a jailhouse phone call was not made by "tapping into the telephone wires" and so the wiretap statutes governing interceptions of wire communications were inapplicable. *Id.* at 403.

United States or Texas, it must be excluded from evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.23. A defendant who moves to suppress evidence under article 38.23 has the burden to produce evidence of a statutory violation. *State v. Robinson*, 334 S.W.3d 776, 779 (Tex.Crim.App.2011). If the defendant makes a prima facie showing of a statutory violation, the State has the burden of production of evidence rebutting that prima facie showing. *Id.* at 780.

### 2. Facts Concerning the Recorded Phone Call

Josh Nye, the detention officer who booked Siddiq into the jail, testified that during book-in, detainees are informed before they are taken to a cell that they can make a phone call from a phone at the book-in desk.[6] If a detainee wishes to make a call, the book-in officer writes down the name and phone number of the person to whom the call is made and dials the phone for the detainee. Every call is automatically recorded to an "in-house server," which contains a database accessible to the detention officers.

The book-in desk phone at the Frisco jail does not have a verbal prompt warning the user that the call is being recorded, nor did Officer Nye warn Siddiq that his call would be recorded. When asked whether there was "anything ... elsewhere in the jail to let [detainees] know [that] their phone call will be monitored," Officer Nye explained that there are two signs taped to the glass panel above the door to the Intoxilyzer/blood-draw room. According to Officer Nye, both signs had been posted in the same place since at least April 2013, were posted on the night that Siddiq was arrested, and were "in view when you're walking" into the blood-

draw room. The signs are to the right of and behind the book-in desk, about five to seven feet away. State's exhibit 8, a photograph of the glass window above the Intoxilyzer/blood-draw room, showed a Xerox paper sign taped to the right side of the window that said, "PHONE CALLS ALL PHONE CALLS ARE SUBJECT TO MONITORING." Another Xerox paper sign is taped to the left side of the same window, and it states, "Audio and Video Recording in Progress."

Officer Nye agreed that the signs were posted seven to seven and one-half feet above ground level and that while Siddiq was making his call, his back would have been turned toward the signs. Officer Nye explained, however, that he would have photographed Siddiq before letting him make the call and that "[t]he best place to view the sign is when we take the photographs[;] they [detainees] are standing there two minutes or so, and they're standing right there looking at the sign in the photograph." Officer Nye testified that he instructs detainees to keep their heads up and look straight at him while he is taking their mugshots. He said detainees have time to read the sign "[w]hile waiting for the photo to be put in the system."

Officer Nye did not know whether Siddiq had seen the sign. But he did think that a "reasonable ... objective person would have reasonable time to see and read th[e] sign."

### 3. The Law-Enforcement Exception Applies

▮ Relying on the consent exception to the pertinent state and federal statutes, Siddiq argues that the two signs posted in the jail did not provide him with the type of meaningful notice upon which a finding

---

**6.** The trial court permitted defense counsel to voir dire Officer Nye before he testified in front of the jury; Officer Nye's voir dire and trial testimony were substantially similar.

of his implied consent to the recording could be based. But, because the undisputed evidence shows that the law-enforcement exception applies here, we need not decide whether the consent exception applies. *See, e.g., Amador,* 275 S.W.3d at 878–79 (requiring appellate court to uphold the trial court's ruling that is supported by the record and correct under any theory of law applicable to the case); *Stevens,* 235 S.W.3d at 740 (same); *Armendariz,* 123 S.W.3d at 404 (same); *see also Hailey v. State,* 87 S.W.3d 118, 121 (Tex.Crim.App. 2002) ("It is well-settled that a Court of Appeals can **affirm** a trial court's decision on a legal theory not presented to the trial court"), *cert. denied,* 538 U.S. 1060, 123 S.Ct. 2218, 155 L.Ed.2d 1111 (2003).

Officer Nye stated that every call placed from the Frisco jail book-in desk is automatically recorded and stored to a database accessible to the officers. The sign stating that "ALL PHONE CALLS ARE SUBJECT TO MONITORING" is additional evidence of a policy. And Officer Nye's testimony that this sign had been posted in the same location since April 2013 and was posted on the night of Siddiq's arrest establishes that the policy existed when Siddiq's phone call to his father was recorded. Because the law-enforcement exception to the federal wiretap statute is applicable to recordings by law enforcement of phone calls from jails or detention centers when the recordings are routinely made pursuant to a policy and because the state wiretap statute and penal code section 16.02 both utilize the same definitions of "intercept" and "electronic, mechanical, or other device" as the definitions in the federal statute that create the law-enforcement exception, the law-enforcement exception applies to Siddiq's call. *See Lewis,* 406 F.3d at 17–19 ("We hold that a recording made pursu-

ant to a routine prison practice of monitoring all outgoing inmate calls under a documented policy of which inmates are informed does not constitute an interception [under the federal wiretap statute.]"); *Friedman,* 300 F.3d at 121–23 (holding law-enforcement exception to federal wiretap statute applied to recording of defendant's call from jail because all calls were routinely taped by law-enforcement officers pursuant to an existing policy); *Hammond,* 286 F.3d at 192 (holding law-enforcement exception to federal wiretap statute applied to recording of defendant's call from jail because the bureau of prisons "was acting pursuant to its well-known policies in the ordinary course of its duties in taping the calls"); *Amati,* 176 F.3d at 955–56 (holding law-enforcement exception to federal wiretap statute applied to plaintiff employee's calls from police department because police department routinely recorded all calls placed on one of its phone lines—including calls by employees); *Van Poyck,* 77 F.3d at 291–92 (holding law-enforcement exception to federal wiretap statute applied to recording of defendant's call from detention center because center routinely taped all outgoing inmate telephone calls).

Viewing the evidence from the suppression hearing and the trial in the light most favorable to the trial court's ruling—that is, giving the State as the party that prevailed in the trial court the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence,[7] and reviewing de novo the question of whether this given set of historical facts amounts to a violation of the federal or state wiretap statutes or of Texas Penal Code section 16.02, we hold that because the law-enforcement exception applies to Siddiq's recorded call from the

---

7. *See Garcia–Cantu,* 253 S.W.3d at 241 (applying standard of review).

booking desk at the Frisco jail, the trial court did not err by determining that the recording did not violate the federal or state wiretap statutes or penal code section 16.02. *See, e.g., Lewis,* 406 F.3d at 17–18 (holding law-enforcement exception applied); *Friedman,* 300 F.3d at 122–23 (same); *Hammond,* 286 F.3d at 192 (same); *Amati,* 176 F.3d at 955–56 (same); *Van Poyck,* 77 F.3d at 291–92 (same). Accordingly, the trial court did not abuse its discretion by admitting the recorded phone call into evidence over Siddiq's objections that it violated these statutes.

We overrule Siddiq's first through third points.

### C. BAC Results

In his fifth point, Siddiq contends that because the medical technician who drew his blood admitted that in certain respects she did not follow her own training or generally accepted medical practices, his blood draw was not performed in a reasonable manner as required by the Fourth Amendment and *Schmerber v. California* and that therefore the BAC results were inadmissible. 384 U.S. 757, 758–59, 86 S.Ct. 1826, 1829, 16 L.Ed.2d 908 (1966); *see State v. Johnston,* 336 S.W.3d 649, 659–64 (Tex.Crim.App.) (applying *Schmerber*), *cert. denied,* 565 U.S. 866, 132 S.Ct. 212, 181 L.Ed.2d 115 (2011).

### 1. The Law Concerning Reasonableness of Blood Draws

■■■■ A blood draw constitutes a search and seizure under the Fourth Amendment. *Schmerber,* 384 U.S. at 767, 86 S.Ct. at 1834; *Pacheco v. State,* 347 S.W.3d 849, 853 (Tex. App.—Fort Worth 2011, no pet.). Whether a blood draw is conducted pursuant to a warrant or not, the assessment of reasonableness is purely

a matter of Fourth Amendment law. *Johnston,* 336 S.W.3d at 661. The "Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." *Schmerber,* 384 U.S. at 768, 86 S.Ct. at 1834. "[T]he overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." *Winston v. Lee,* 470 U.S. 753, 760, 105 S.Ct. 1611, 1616, 84 L.Ed.2d 662 (1985) (quoting *Schmerber,* 384 U.S. at 767, 86 S.Ct. at 1834).

■■■■ A two-part test exists to determine whether a blood draw is reasonable: (1) did the police have justification to require the suspect to submit to a blood test, and (2) did the police employ reasonable means and reasonable procedures in taking the suspect's blood? *Johnston,* 336 S.W.3d at 658. The second question is twofold. *Id.* To determine whether the police used reasonable means to take a suspect's blood, a court must determine whether the test itself is reasonable. *Id.* To determine whether police employed a reasonable procedure for that test, a court must determine whether the test was performed in a reasonable manner.[8] *Id.* When reviewing the reasonableness of a blood draw, courts consider the evidence on a case-by-case basis in light of the totality of the circumstances surrounding the blood draw. *Id.* at 661.

■■■■ Although the Court in *Schmerber* based its determination that the blood draw was performed in a reasonable manner in part on the fact that it was performed by a doctor in a hospital setting, the Court's overriding concern about the

---

8. This is the prong Siddiq challenges; he challenges only the second prong of the second

inquiry, that is, the procedure the medical technician used in carrying out the blood test.

manner in which the test was performed focused on the effect of the intrusion upon the individual, not the reliability of the test results. 384 U.S. at 771–72, 86 S.Ct. at 1836; see Winston, 470 U.S. at 760, 105 S.Ct. at 1616; United States v. Fowlkes, 804 F.3d 954, 962–66 (9th Cir.2015) (op. on reh'g) (discussing Schmerber in the context of a body cavity search and analyzing the reasonableness of the search in the context of the scope of intrusion and its effect on the suspect, particularly the risk for physical and emotional trauma). As explained by the Supreme Court in Winston:

> A crucial factor in analyzing the magnitude of the intrusion in Schmerber is the extent to which the procedure may threaten the safety or health of the individual. "[F]or most people [a blood test] involves virtually no risk, trauma, or pain." Moreover, all reasonable medical precautions were taken[,] and no unusual or untested procedures were employed in Schmerber; the procedure was performed "by a physician in a hospital environment according to accepted medical practices." Notwithstanding the existence of probable cause, a search for evidence of a crime may be unjustifiable if it endangers the life or health of the suspect.

470 U.S. at 761, 105 S.Ct. at 1617 (citations omitted). The Court in Winston articulated three factors—beyond the threshold requirements of probable cause or a valid search warrant—that Schmerber instructs courts to balance in determining the reasonableness of a bodily intrusion: (1) the extent to which the procedure may threaten the safety or the health of the individual; (2) the extent of the intrusion upon the individual's dignitary interests in personal privacy and bodily integrity; and (3) the community's interest in fairly and accu-

rately determining guilt or innocence. Id. at 761–63, 105 S.Ct. at 1617–18.

### 2. Facts Concerning the Blood Draw

Four witnesses testified about the blood draw and the BAC results: Tim Henderson, the phlebotomy supervisor for Denton Regional Medical Center; Donna Doolittle, the blood-draw technician; Chris Youngkin, the DPS forensic scientist who tested Siddiq's blood sample; and Siddiq's cousin, who was a fourth-year medical student.[9]

Henderson testified regarding proper blood-draw practices according to his training and his hospital's procedures. He explained that the techniques for medical and law-enforcement blood draws are the same except that for law-enforcement blood draws, the site is cleaned with soap and water rather than isopropyl alcohol to reduce the risk of cross-contamination when testing for alcohol.

In describing how a site should be properly cleaned, Henderson stated that a technician should use concentric circles, beginning at the middle of the planned insertion site and going around in increasingly larger circles to wipe possible contaminants away from the site. According to Henderson, up and down swipes are not considered proper phlebotomy technique because contaminants can be reintroduced across the insertion site.

He testified that at his hospital, he is allowed to use only one tourniquet and then dispose of it; his hospital staff does not reuse tourniquets because of the potential for cross-contamination.

The Denton County Regional Medical Center's training manual advises not to leave a tourniquet on for more than one minute, and Henderson trains the hospi-

---

**9.** Our recitation of the facts combines the pretrial and the trial testimony concerning the reasonableness of the blood draw performed on Siddiq.

tal's phlebotomists not to leave tourniquets on for more than one minute. Henderson opined that if the tourniquet is left on the arm for too long, pooling or hemoconcentration can occur, which will compromise the integrity of the sample, and may affect some medical tests, like tests for potassium. But on cross-examination, Henderson admitted that he was not aware of any literature indicating that pooling or hemoconcentration affects the BAC measurement in a sample, nor had he overheard anyone at the hospital say that it did.

According to Henderson, after a sample is obtained, the tube should be fully inverted ten times—that is, turned totally upside down—to "get a complete mixture of the additives and agent to make sure you protect the integrity of the sample."

Henderson had watched the video of Siddiq's blood draw and pointed out several problems:

1. The hospital uses a bed for legal blood draws rather than a chair, and Siddiq was sitting on a bench;

2. Siddiq's arm was not straight and was at a strange angle; a stressed arm can cause a rupturing of blood cells that can compromise the integrity of a sample;

3. Doolittle used an up and down motion instead of a concentric motion when cleaning the site;

4. Immediately before injection, Doolittle tapped Siddiq's arm again with an unsterilized glove and then did not reclean the insertion site so that Henderson could not be sure whether Doolittle might have introduced a contaminant onto the site;

5. Doolittle left the tourniquet on for longer than one minute; and

6. Doolittle did not fully invert the sample after taking it.

Henderson admitted that he had never drawn blood in a jail setting but said that Doolittle's techniques would not be considered accepted medical practice at his hospital. On cross-examination, after reviewing with Henderson each of the above listed concerns Henderson had expressed concerning Doolittle's technique, the prosecutor asked Henderson, "But you cannot, and you're not here to testify to—you cannot testify that any of those things had any effect whatsoever on the ultimate blood-alcohol concentration of this Defendant?" Henderson answered, "I can't testify to that." Henderson also agreed that Doolittle correctly (1) used the left arm because of the fresh tattoo on the right, (2) used a smaller-sized needle, (3) selected a good site for the needle stick and tourniquet placement, (4) performed the venipuncture correctly except for the angle of Siddiq's arm, (5) filled and removed the blood tube, (6) applied gauze, and (7) monitored Siddiq afterward.

Doolittle drew Siddiq's blood at the jail. She is a National Registered Certified Medical Assistant; she completed her training program in 2000. Since 2009, Doolittle had been taking DWI blood draws for the Collin County and Frisco jails. She previously worked for a doctor's office and then in the Collin County Jail infirmary where she performed thirty to fifty blood draws per day. Doolittle estimated that she had drawn blood thousands of times from 2000 to 2014.

Doolittle testified that the blood-draw room at the Frisco jail was clean, that it qualified as a sanitary place, and that all of her equipment was sterile. Detention officers routinely cleaned the room with a solution sprayed on a towel; they cleaned the blood-draw room at the beginning of their shifts, before and after each blood draw, and if someone entered the room for a purpose other than a blood draw. Ac-

cording to Doolittle, on the night of Siddiq's blood draw, she saw one of the detention officers clean the blood-draw room before she took the sample.

The bench in the blood-draw room is concrete, L-shaped, and has a bar behind it. According to Doolittle, it is not feasible to use a phlebotomy chair to perform a blood draw in a jail because people are hostile and because safety is a concern.

Before beginning, Doolittle laid a paper towel on the area where she drew the blood and put her equipment on top of that so that the sample would not be contaminated by the cleaning chemicals used in the room. Doolittle decided to use Siddiq's left arm because he had a fresh tattoo on his right arm; she did not want to "mess up" his tattoo or contaminate the blood. Before cleaning the site, she put on clean gloves. Doolittle tied on the tourniquet and cleaned the site with BZK swabs using an up and down motion; she did not use concentric circles. According to Doolittle, she used a different side of the BZK swab for the down stroke than she did for the up stroke. Doolittle testified that she had used the tourniquet once before that night, but she had cleaned it with soap and water in between uses.

Siddiq was reluctant to have his blood drawn. Consequently, it was "kind of" hard for Doolittle to straighten his arm to properly position it for the blood draw. But Doolittle thought that she had adequately positioned Siddiq's arm straight enough to get blood. Because Siddiq was scared of the needle, Doolittle tried to calm him down; she offered to use a smaller needle to make him more comfortable. Doolittle said that before using her gloved hand to tap Siddiq's vein, she wiped her hand again on the BZK swab, which had been folded and was large.

Doolittle left the tourniquet on Siddiq's arm for approximately one minute and sixteen seconds. Doolittle testified at the pretrial hearing that she was trained not to leave a tourniquet on for more than a range of one to two minutes but agreed at trial that she had been trained not to leave it on for more than one minute.

Although Siddiq flinched when Doolittle put the needle in his arm, she did not have any concerns about the procedure. She was able to find a vein on her first attempt and drew a full vial of blood. She applied a Band-Aid on the site to make sure the bleeding stopped. While Officer Nye was booking Siddiq into the jail, Doolittle stood off to the side watching Siddiq "to make sure there was no blood oozing out of his arm or anything like that so [she] could change his gauze or Band-Aid." She monitored him for at least fifteen minutes. Siddiq never complained during or after the blood draw. Doolittle agreed that the blood draw was uneventful.

Doolittle admitted that she was trained to clean a site with concentric circles "[i]n normal circumstances," and she agreed that a site could possibly be contaminated by the up-and-down wiping method she used. But she also agreed that when dealing with a drunk person in a jail setting, "it's get the job done and get out" and that "[f]or safety," she would "change[ ] the medically accepted practice." Doolittle admitted that she did not use her concentric circle training, which was standard medical practice, in cleaning the injection site. The State, however—after asking Doolittle about each of the technique departures that Henderson had testified to—elicited Doolittle's testimony that she had asked Andrew Macey, a Department of Public Safety lab tech, whether "any of this mattered for [Siddiq's] blood-alcohol concentration test" and that "[h]e said it didn't matter."

Chris Youngkin, the DPS forensic scientist who tested Siddiq's blood sample, testified that occasionally blood samples he receives cannot be tested; this was not one of those occasions. He tested Siddiq's blood sample, and the BAC was 0.238. Youngkin explained that the type of tube the sample was collected in contains a preservative, sodium fluoride, which helps prevent contamination if the blood were to contain an organism that could possibly allow alcohol to be formed after collection. The tubes also contain an anticoagulant. Refrigeration helps to maintain the BAC at the same level as at the time of collection. He was not aware of documentation in "any publication where blood collected from a living donor into a gray-top tube [like the one used here] ever produced any alcohol."

On cross-examination, Youngkin stated that he was aware of studies "under very specific circumstances" in which sodium fluoride did not kill candida albicans and alcohol formed in the blood; however, he also said that the preservative used in the gray-top tube is "proven to be sufficient when drawing blood from live donors." On redirect, he explained that "[i]n that particular study [that the defense had questioned him about], blood was used from a blood bank" as opposed to blood drawn from a living person and "had additional sugar added to it, and the organisms—the organisms, excuse me, were added to the tube intentionally." According to Youngkin, the amount of sodium fluoride in the test tube included in a blood-draw kit would be more than sufficient to kill anything living in the blood.

Youngkin read from the instructions included in law-enforcement blood kits, which state, "Immediately after the blood collection, slowly mix the anticoagulant powder and blood by inverting the blood vial several times." His understanding of invert was "to turn it upside down."

Siddiq's cousin testified that she was a fourth-year medical student and that as part of her training, she had learned that "[w]hen you lose the fluid and things in your blood, then the red blood cells take up what is left in your blood. That's hemoconcentration. That's when your red blood cells make up the highest component of your blood." She also said that hemoconcentration can be caused by dehydration or by putting a tight rubber band around an area.

### 3. Siddiq's Blood Draw Was Performed in a Reasonable Manner

Siddiq specifically challenges "whether the test was performed in a reasonable manner"—the second prong of *Schmerber*'s second inquiry. *See Johnston*, 336 S.W.3d at 658. Siddiq argues that the blood draw by Doolittle was not performed in a reasonable manner because it differed from Denton Regional Medical Center's blood-draw procedures and Henderson's training concerning proper blood-draw procedures in the following ways: (1) Siddiq was sitting on a bench rather than in a chair; (2) his arm was not completely straight; (3) Doolittle did not clean the site with concentric circles; (4) after cleaning the site, she tapped Siddiq's vein with her gloved finger, possibly without recleaning it; (5) she left the tourniquet on for one minute and sixteen seconds; (6) she reused a disposable tourniquet; and (7) she did not fully invert the sample.

Relying on these asserted deviations from standard technique, Siddiq contends that "reasonableness cannot exist if standard medical procedures are not followed and since Doolittle did not act in accordance with standard medical practices—by her own admission and as proved by other expert testimony—her testimony should

not be permitted." [Emphasis and footnote omitted.] This argument by Siddiq goes less to the scope of the blood draw's intrusion and its effect on him than to the resulting integrity of the sample; thus, this argument concerning the admission of the BAC results is more in the nature of a *Kelly* reliability argument, rather than a Fourth Amendment reasonableness argument. *See Kelly v. State*, 824 S.W.2d 568, 573 (Tex.Crim.App.1992); *see also State v. Esparza*, 413 S.W.3d 81, 88 (Tex.Crim. App.2013) (explaining difference between complaint that breath-test results were inadmissible as not scientifically reliable and complaint that the results should be suppressed under article 38.23 and the Fourth Amendment exclusionary rule). But Siddiq has not raised a *Kelly* complaint on appeal. *See Esparza*, 413 S.W.3d at 87–90 (holding motion to suppress exclusively raising issues of suppression of illegally-obtained breath test did not raise *Kelly* complaint regarding scientific reliability); *Clement v. State*, No. 02–14–00267–CR, 2016 WL 3902494, at *3 n. 3 (Tex.App.—Fort Worth July 14, 2016, no pet. h.) (explaining that qualification, reliability, and relevance are separate requirements of expert testimony and that each requires a separate objection).

Relying on these same asserted deviations from standard technique, Siddiq also contends that the blood draw was not performed on him in a reasonable manner; Siddiq's Fourth Amendment reasonableness analysis focuses on whether, in drawing blood, the medical technician departed in any way from accepted medical practice or the accepted standard of care instead of on whether any such departure resulted in an unreasonable degree of intrusion or harm to the individual. Neither Texas courts nor courts in other states interpret *Schmerber*'s holding so broadly. *See Adkins v. State*, 418 S.W.3d 856, 860–61 (Tex.

App.—Houston [14th Dist.] 2013, pet. ref'd) (holding blood draw performed in reasonable manner despite fact that nurse placed cotton ball on table before using it to clear injection site when blood was drawn by registered nurse in sanitary room at police station and "nothing on the video indicated that appellant suffered any pain as a result of the procedure"); *Gambini v. State*, No. 01–12–00395–CR, 2013 WL 4680380, at *5 (Tex.App.—Houston [1st Dist.] Aug. 29, 2013, pet. ref'd) (mem. op., not designated for publication) ("There was no evidence introduced that Carrico's actions of touching things with his gloved hands exposed Gambini to an unreasonable risk of pain or infection."); *People v. Harris*, 234 Cal.App.4th 671, 184 Cal.Rptr.3d 198, 216–17 (2015), *review denied* (June 10, 2015) (explaining that in determining reasonableness of blood draws conducted outside of hospital or medical facility, California courts "emphasize the key inquiry is whether 'the manner in which the sample was obtained deviated so far from the medical practices found to be reasonable in *Schmerber* as to render the seizure constitutionally impermissible.' .... Under this standard, the court considers the overall reasonableness of the blood draw" and determines whether "the test conditions subjected [the arrestee] to 'an unjustified element of personal risk of infection or pain'" (citations omitted)); *State v. Noceo*, 223 Ariz. 222, 221 P.3d 1036, 1039–41 (Ariz.Ct. App.2009), *cert. denied*, 562 U.S. 970, 131 S.Ct. 480, 178 L.Ed.2d 304 (2010) (holding that although blood draw performed while suspect was standing violated police department policy and posed an additional risk, blood draw was performed in reasonable manner under Fourth Amendment); *State v. May*, 210 Ariz. 452, 112 P.3d 39, 42 (Ariz.Ct.App.2005) (holding that although blood draw performed while suspect was standing violated standard of care as articulated by expert, blood draw was per-

formed in reasonable manner under Fourth Amendment); *State v. McMaster*, 118 N.J.Super. 476, 288 A.2d 583, 584 (1972) ("The concern of the United States Supreme Court and our own Supreme Court with respect to such testing procedures is that they be carried out under such circumstances as to protect the life and health of the individual tested."); *see also Johnston*, 336 S.W.3d at 662 n. 53 (citing the *Schmerber* analysis from *Noceo* and *May*). Thus, contrary to Siddiq's position, the focus of a Fourth Amendment analysis to determine if the manner used to seize a blood sample was reasonable is not on whether departures from standard technique or the standard of care occurred but on the effect of the bodily intrusion (including any departures from standard technique or the standard of care) on the defendant's safety, health, dignitary interests, and personal privacy. *See Winston*, 470 U.S. at 761, 105 S.Ct. at 1617; *Schmerber*, 384 U.S. at 771–72, 86 S.Ct. at 1836.

Looking to the effect of the blood draw performed—including the effect of Doolittle's departures for standard technique or the standard of care—on Siddiq's safety, health, dignitary interests, and personal privacy, the record shows the following. Doolittle performed the blood draw in a clean room with a law-enforcement provided blood vial. Although there is some evidence that Siddiq was reluctant to have his blood drawn, Doolittle tried to calm him and offered to, and did, accommodate him by using a smaller needle. The video of the blood-draw procedure does not reflect that Doolittle used force to obtain Siddiq's blood sample, nor did anyone testify that she did so. There is simply no evidence that the manner in which Doolittle performed the blood draw on Siddiq—including the departures from accepted medical practices—threatened Siddiq's safety or health, caused Siddiq trauma or pain, endangered Siddiq's life or health, or created a level of intrusiveness greater than a typical blood draw. *See Winston*, 470 U.S. at 761–63, 105 S.Ct. at 1617–18. We therefore hold that the trial court did not err by determining under the totality of the circumstances that the blood draw by Doolittle on Siddiq was performed in a reasonable manner as required by the Fourth Amendment. *See id.* at 761–63, 105 S.Ct. at 1617–18. *Schmerber*, 384 U.S. at 758–59, 86 S.Ct. at 1829; *Johnston*, 336 S.W.3d at 659–64.

We overrule Siddiq's fifth point.

## IV. ARTICLE 38.23(a) JURY INSTRUCTIONS

In his fourth and sixth points, Siddiq contends the trial court erred by refusing to include his requested article 38.23(a) instructions in the jury charge.

### A. Standard of Review and the Law Concerning 38.23(a) Jury Instructions

■■■ Under article 38.23(a), "[n]o evidence obtained by an officer . . . in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused" at trial. Tex. Code Crim. Proc. Ann. art. 38.23(a). When evidence presented before the jury raises a question of whether the fruits of a police-initiated search or arrest were illegally obtained, the jury must be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of article 38.23, then it must disregard that evidence. *Robinson v. State*, 377 S.W.3d 712, 719 (Tex.Crim.App.2012); *see* Tex. Code Crim. Proc. Ann. art. 38.23(a).

■■■ To be entitled to an article 38.23(a) instruction, the defendant must show that (1) an issue of historical fact was raised in front of the jury, (2) the fact was

contested by affirmative evidence at trial, and (3) the fact is material to the constitutional or statutory violation that the defendant has identified as rendering the particular evidence inadmissible. *Robinson*, 377 S.W.3d at 719. In short, there must be a genuine dispute about a material fact. *Madden v. State*, 242 S.W.3d 504, 510 (Tex.Crim.App.2007). To be material, the disputed fact issue must be an essential one in deciding the lawfulness of the challenged conduct. *Id.* at 511. Evidence that would justify an article 38.23(a) instruction may be derived "from any source," no matter whether "strong, weak, contradicted, unimpeached, or unbelievable." *Robinson*, 377 S.W.3d at 719.

 If there is no disputed factual issue, the legality of the conduct is determined by the trial judge alone, as a question of law. *Madden*, 242 S.W.3d at 510. And if other facts, not in dispute, are sufficient to support the lawfulness of the challenged conduct, then the disputed fact issue is not submitted to the jury because it is not material to the ultimate admissibility of the evidence. *Id.*

### B. Siddiq's Requested Instructions

Siddiq submitted a proposed jury instruction regarding the recorded phone call he placed to his father. The instruction, in pertinent parts, informed the jury that a phone call from a jail could be recorded if meaningful notice was provided that the call was subject to monitoring or recording. The instruction then stated,

> If you do not find beyond a reasonable doubt that Adeel Siddiq was given meaningful notice that his phone call was being recorded you must completely disregard the phone conversation between Adeel Siddiq and Anwar Siddiq. (*Banargent v. State*, 228 S.W.3d 393 (Houston 14th Ct.App.200[7] ))[.]

Siddiq also submitted a proposed jury instruction regarding the BAC results. That instruction, in pertinent parts, informed the jury that the police must employ reasonable techniques in performing a blood draw and that

> [b]efore you may consider the evidence obtained as a result of the blood test taken by Adeel Siddiq, you must all agree that the [S]tate has proved, beyond a reasonable doubt that –
>
> 1. Officer Walden was justified in getting a warrant to get Adeel Siddiq's blood and it was reasonable to use a blood draw to secure the blood evidence; and
>
> 2. Donna Doolittle used reasonable equipment and technique following acceptable medical practices in drawing Adeel Siddiq's blood. And the location was a safe place to draw blood.
>
> If you find both elements 1 and 2 beyond a reasonable doubt, then you may consider the blood test results as part of the evidence in this case.
>
> If you do not find both elements 1 and 2 beyond a reasonable doubt, then you will disregard all evidence of the blood test and its results.

### C. Siddiq Was Not Entitled to the Jury Instructions He Requested

#### 1. Legality of Phone Recording Established by Undisputed Facts

 In his fourth point, Siddiq contends that the jury should have resolved the historical fact of whether the signs posted in the Frisco jail provided meaningful notice to him that his phone call to his father from the book-in desk could be monitored or recorded. As discussed above, however, the undisputed facts establish that Siddiq's phone call was not illegally recorded because the law-enforce-

ment exception applies to the recording of the call. *See* 18 U.S.C.A. § 2510(4), (5)(a)(ii); Tex. Code Crim. Proc. Ann. art. 18.20, § 1(3), (4); Tex. Penal Code Ann. § 16.02(a); *Madden*, 242 S.W.3d at 510. Siddiq was therefore not entitled to the 38.23(a) instruction he requested concerning his recorded phone call, and the trial court did not err by refusing to submit it to the jury. *See Madden*, 242 S.W.3d at 510 (explaining that if other facts not in dispute establish lawfulness of challenged conduct, then disputed fact issue is not submitted to jury in a 38.23(a) jury instruction because it is not material to the ultimate admissibility of the evidence); *see also Spence v. State*, 325 S.W.3d 646, 653–54 (Tex.Crim.App.2010) (holding defendant not entitled to a 38.23(a) jury instruction regarding issue of whether he was illegally parked blocking driveway because traffic stop was legal based on lack of front license plate on bumper); *Gerron v. State*, 119 S.W.3d 371, 377 (Tex.App.—Waco 2003, no pet.) (mem. op.) (holding defendant not entitled to 38.23(a) jury instruction because the State's evidence raised several alternative reasons supporting legality of stop and only one of the reasons involved a disputed fact).

Additionally, the 38.23(a) jury instruction request by Siddiq concerning the recorded phone call did not raise a material fact issue in any event. The issue of whether the signs at the Frisco jail provided meaningful notice sufficient to support Siddiq's implied consent to the recording of his phone call to his father is a legal issue, not an issue of material fact. *See, e.g., Madden*, 242 S.W.3d at 510–11 ("The jury . . . is not an expert on legal terms of art . . . . It cannot be expected to decide whether the totality of certain facts do or do not constitute 'reasonable suspicion' under the law."); *see also, e.g., State v. Troy*, 198 N.C.App. 396, 679 S.E.2d 498, 500–01 (2009) (recognizing that trial court determined as a matter of law whether notice provided to inmate gave rise to implied consent to recording); *United States v. Faulkner*, 323 F.Supp.2d 1111, 1117 (D.Kan.2004) (addressing analysis of whether recorded jailhouse conversations fall within consent exception to federal wiretap statute as question of law).

We overrule Siddiq's fourth point.

**2. No Disputed Material Fact Exists Concerning Blood Draw's Compliance with Fourth Amendment Reasonableness Requirement**

In his sixth point, Siddiq contends that the historical, disputed material facts for the jury to decide with regard to the blood draw are whether Doolittle left the tourniquet on too long and whether she used acceptable medical standards in cleaning the site. But Doolittle admitted at trial that accepted medical practices do not include leaving a tourniquet on longer than one minute or using an up-and-down motion to clean an injection site. Whether the blood draw was nevertheless reasonable under the Fourth Amendment in light of those two departures from accepted medical practices was a question of law for the trial court, not a question of fact for the jury. *See Ramirez v. Knoulton*, 542 F.3d 124, 128 (5th Cir.2008) ("[T]he ultimate determination of Fourth Amendment objective reasonableness is a question of law." (quoting *White v. Balderama*, 153 F.3d 237, 241 (5th Cir.1998))); *United States v. Williams*, 343 F.3d 423, 435 (5th Cir.) ("Reasonableness under the Fourth Amendment . . . Clause is a legal conclusion."), *cert. denied*, 540 U.S. 1093, 124 S.Ct. 966, 157 L.Ed.2d 800 (2003). The trial court thus did not err by refusing to include a 38.23(a) instruction about the blood draw in the jury charge. *See Robinson*, 377 S.W.3d at 719.

We overrule Siddiq's sixth point.

### V. Conclusion

Having overruled all of Siddiq's points, we affirm the trial court's judgment.

DAUPHINOT, J., filed a dissenting opinion.

### LEE ANN DAUPHINOT, JUSTICE, DISSENTING

I must respectfully dissent from the decision of the conscientious majority for the following reasons:

1. I do not understand the majority's reliance on the federal police exception to the prohibition against wiretaps to override the Texas prohibition against wiretaps that lack both judicial approval and consent by a party to the conversation.

2. Although there is no suggestion that Appellant's father knew that his conversation with his son was being recorded, is the majority saying that Appellant had notice that his call was being recorded when one warning sign was at the blood-draw room and the other warning sign was behind him (and more than seven feet high) when he was at the book-in desk where he made the phone call?

3. Is the testimony that the blood was not drawn in compliance with proper blood-draw procedures irrelevant because the blood was drawn for the purpose of criminal prosecution?

4. If the admissibility of both the recording of the telephone conversation and the blood-draw results was governed by article 38.23 of the code of criminal procedure, why was Appellant not entitled to an article 38.23 instruction to properly guide the jury?

1. *State v. Daugherty*, 931 S.W.2d 268, 272 (Tex.Crim.App.1996).

2. *Hernandez v. State*, 988 S.W.2d 770, 775 (Tex.Crim.App.1999).

"Clearly, whether evidence has been illegally obtained is a different and separate question from whether an exclusionary rule should apply."[1] The federal rule does not necessarily govern the Texas rule. Texas may grant greater, although not lesser, protection to a person accused of committing a crime.[2]

The legislature's mandate in article 38.23 is clear and unequivocal,[3] and Appellant was entitled to the instruction he requested in both instances. Because the majority does not so hold, I must respectfully dissent.

3. *See* Tex. Code Crim. Proc. Ann. art. 38.23(a) (West 2005).