# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00495-CR

---

**Robert Corey Hildebrandt, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 368TH DISTRICT COURT OF WILLIAMSON COUNTY
### NO. 22-1512-K368, THE HONORABLE SARAH SOELDNER BRUCHMILLER, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

In his sole issue on appeal, Appellant Robert Corey Hildebrandt contends that the trial court erred when it denied his motion to suppress the results of a blood draw taken pursuant to a search warrant after his arrest for felony driving while intoxicated.  *See* Tex. Penal Code §§ 49.04(a), .09(b).  Because we conclude that the trial court did not abuse its discretion when it denied the motion to suppress, we affirm the trial court's judgment of conviction.

## BACKGROUND

Hildebrandt was arrested for driving while intoxicated.  The arresting officer, Officer Gannon Hurney with the Cedar Park Police Department, obtained a search warrant to have Hildebrandt's blood drawn, which was done at the Williamson County Jail by medical technician David Miller.  Hildebrandt filed a motion to suppress the results.  He argued that the manner in

which the blood draw was conducted violated his Fourth Amendment protection against unreasonable searches and seizures.

A hearing was held on the motion to suppress. A video recording of the blood draw was admitted into evidence. The recording came from a wall-mounted camera located in a back corner of the room. The recording depicts Hildebrandt sitting in the opposite corner of the room in a blood-draw chair. Officer Hurney and a deputy with the Williamson County Sheriff's Office were in the room observing. Miller introduced himself and stated that he was a medical officer that worked at the jail, a qualified technician, a certified EMT Basic—emergency medical technician— and a trained phlebotomist with three years' experience. He stated that he was going to perform a blood draw. Hildebrandt responded, "Yeah, right." Miller asked, "Can I see your arm?" Hildebrandt responded, "No, y'all will have to do the whole spiel, tie me up." Miller asked Hildebrandt if he knew that there was warrant, and Hildebrandt responded, "Yeah, cool, I'll wait for you to do it." A restraint chair was brought in and additional deputies assisted with moving Hildebrandt to the chair and applying the restraints. Hildebrandt did not struggle against the deputies while they led him to the chair and attached the straps.

While Hildebrandt was being restrained in the chair, Miller started unboxing the blood-draw kit. While doing so, he showed Officer Hurney his hand and commented that it was shaking. Officer Hurney asked him if it was from caffeine, and Miller responded affirmatively. Miller also noted that there was a discrepancy between the expiration dates on the outside of the blood-draw kit's box and on the tubes inside. Miller explained to Officer Hurney that the box was labeled September 31st, which he noted does not exist, and the tubes were labeled September 30th. He reassured Officer Hurney that it was not a problem because both of those dates were in the future.

2

Once Hildebrandt was secure in the chair, Miller began the blood draw on Hildebrandt's right arm. During the draw, Hildebrandt commented, "You've been doing this for three years and you shake that bad." Miller responded, "No man, that's just the caffeine. I've been drinking caffeine for like twelve years and I still shake from it." In response to an apparent delay or difficulty with finding a vein, Hildebrandt asked Miller, "Are you just guessing or what?" A few minutes later Miller had a vial of blood in his hand but stated that it was not enough to be tested. Miller then moved to Hildebrandt's left arm for a few minutes and appeared to be looking for a vein before moving back to Hildebrandt's right side.

Miller began the process of attempting to find a vein suitable for the blood draw in Hildebrandt's right hand. He applied a tourniquet to Hildebrandt's right wrist. He asked Hildebrandt to make a fist, and Hildebrandt replied, "No, I'm pretty good, you're going to have to wait for this one." Miller attempted to locate a vein for about a minute before removing the tourniquet. He cleaned the area with hydrogen peroxide and reapplied the tourniquet. Miller apologized for something while reapplying the tourniquet, with no response from Hildebrandt. Miller began collecting a blood sample from Hildebrandt's right hand. About a minute and a half into the blood draw, Hildebrandt stated, "My hand's turning purple, bro." Miller responded, "Yeah, you'll be alright." Miller finished the blood draw and removed the tourniquet one minute after the exchange regarding Hildebrandt's hand turning purple. The observing deputies took Hildebrandt out of the room while still in the restraint chair. It took Miller approximately sixteen minutes to collect the two samples, not including the time it took for him to set up and for deputies to put Hildebrandt in the restraint chair. The tourniquet was on Hildebrandt's right wrist for one minute, off for two minutes, and on again for two-and-a-half minutes.

3

After the blood draw, Miller and Officer Hurney remained in the room. Officer Hurney said to Miller, "Sorry about that." Miller responded, "Naw, it is what it is. I had that first vein then my hand kept shaking, I was like, Freaking A." Officer Hurney responded, "He made it harder for you." Miller responded, "Naw, I don't think that would have made too much of a difference. I shook myself out of the vein." Miller then attempted to place one of the vials of blood into a tube but dropped it on the ground before picking it up and successfully putting it in the tube.

During the suppression hearing, the defense called Hildebrandt. He testified that Miller's hands were shaking during the blood draw and that it concerned him because the needle was moving around and was "uncomfortable." He testified that his hand was turning purple. He testified that the entire process was uncomfortable for him because he was strapped to a chair, he was stuck with a needle multiple times—he testified three times—and there were six officers and deputies around him. He testified that he had a bruise on his right arm from the blood draw that was painful and lasted two-and-a-half weeks. He described it as being about two to three inches long and two inches wide. A photo was admitted into evidence that Hildebrandt testified he took of his bruise six days after the blood draw. He testified that he was not "squirming around" or doing anything else to make the blood draw more difficult. He testified that he had had many blood draws done in the past both from donating blood and for medical purposes and that they had never resulted in bruising like he experienced from this one. However, he also testified that he stopped donating blood after he experienced "internal bleeding," and that at least once during his prior blood draw experiences, a phlebotomist had difficulty finding his vein.

On cross-examination by the State, Hildebrandt agreed that the blood test revealed that his blood alcohol level was .13 at the time his blood was drawn and that his recollection of the

4

events was from the perspective of being inebriated above the legal limit. He agreed that he did not complain about being in pain or show signs of being in extreme pain during the blood draw.

Miller testified regarding his experience as a phlebotomist generally and the blood draw he performed on Hildebrandt. He testified that he had a Texas State EMT Basic certificate and had been phlebotomy certified for three years at the time of the blood draw. He testified that he had performed "too many [draws] to number" and that not all blood draws were for DWI evidence collection because he had other medical duties in the jail as well. However, he also testified that DWI blood draws were not common for the day shift, which he works, and that he had done fewer than ten blood draws with a person in a restraint chair.

The video recording described above was played during Miller's testimony. He testified that the room they were in is the "Intoxilyzer room" where the blood draws are also performed. He testified that he followed the protocols and the accepted medical practices that he was trained on. He testified that it is not typical to do blood draws in a restraint chair. He testified that it changes the angle of the arm. When asked about the discrepancy of the expiration dates on the test kit box and the tubes, he agreed that he was trained to check that the dates match, that they did not in this case, and that he wrote on the paperwork that the expiration date on the tubes was September 31st even though it was September 30th. When asked about his hands shaking, Miller testified that he consumes 200 milligrams of caffeine a day, which he explained was "a standard energy drink," on his way to work and that he usually shakes from it but that the shaking wears off later in the morning. He testified that he works 7 a.m. to 7 p.m. According to the video, the blood draw occurred shortly before 8 a.m.

Miller testified that Hildebrandt had made it more difficult than a typical blood draw by requiring that he be in the restraint chair, not being cooperative, talking a lot, and attempting an

5

"intimidation factor." He testified that he was on a higher alert than normal during Hildebrandt's blood draw. He explained that there was a concern that Hildebrandt may "try to do something" during the process. Miller testified that he "stuck" Hildebrandt twice—in his right arm and right hand. He testified that Hildebrandt never indicated that he had an intolerable feeling of pain or discomfort. Miller was shown the photograph of Hildebrandt's bruised arm and testified that bruising after a blood draw is common.

Miller was asked about Hildebrandt's comment about his hand turning purple. Miller opined that it was caused by the tourniquet he put on Hildebrandt's wrist, which restricted the blood flow. He testified that leaving a tourniquet on for too long could result in hypoxia, which he defined as, "cell starvation of oxygen." However, he did not know how long it would take for that to occur and testified that there was not a procedure regarding how long a tourniquet could be left on for.

Sergeant Daniel Romero testified that he was present and operated a handheld camera during the blood draw. This was an additional camera to the one used to record the footage described above. Sergeant Romero testified that he gave the handheld camera to his supervisor after the blood draw was complete. He testified that it is procedure for the supervisor to download the video of a blood draw from the handheld camera. He also testified that it is standard procedure to use a restraint chair when a person refuses a blood draw.

Commander Jeffrey Williams testified that he looked for the handheld camera footage but could not locate it. He testified that the footage should have been preserved. He did not know why it was not in this case.

The State called Officer Hurney to testify about being the arresting officer. He testified that Hildebrandt was "pretty noncompliant" and explained, "Any lawful order I gave, he

refused." He testified that while Miller was attempting to insert the needle during the blood draw, Hildebrandt "was twisting his arm and moving it, making it difficult" in order "to prevent the phlebotomist from taking the blood." He testified that the same thing happened when Miller attempted to proceed on the left arm. In the video recording, Miller is positioned between Hildebrandt and the camera. The twisting of the arm that Officer Hurney described is not apparent on the video, but Hildebrandt's arm is not visible to the camera the entire time due to being blocked by Miller conducting the blood draw. On cross, Officer Hurney agreed that Hildebrandt was not violent, threatening, or flailing around during the blood draw.

After hearing all the evidence and arguments, the trial court denied Hildebrandt's motion to suppress and entered findings of fact and conclusions of law:

### FINDINGS OF FACT

1. The Defendant was lawfully placed under arrest for Driving While Intoxicated.

2. The Defendant refused consent to a blood draw.

3. After law enforcement obtained a search warrant to draw the Defendant's blood, the Defendant remained uncooperative with the blood draw.

4. The Defendant explicitly told law enforcement that they would need to tie him down to get a sample.

5. Due to the defendant's noncooperation, it was necessary for law enforcement to restrain the Defendant in order for the blood draw technician to take a sample.

6. The Defendant was placed in an emergency restraint chair for the duration of the blood draw.

7. The Defendant moved and twisted his arms during the blood draw, making it more difficult to draw a testable sample of the Defendant's blood.

7

8. The Defendant's noncooperation with the blood draw made it more difficult for a blood draw technician to obtain a testable sample.

9. The Defendant suffered no long-term injury from the blood draw.

10. Bruising is a common side effect of a blood draw.

11. The Defendant's blood sample was drawn by certified blood draw technician David Miller.

12. The Defendant's blood sample was taken in a safe, sanitary place.

13. David Miller followed accepted medical procedures for conducting an evidentiary blood draw.

CONCLUSIONS OF LAW

1. David Miller took a sample of the Defendant's blood pursuant to a valid warrant.

2. David Miller was qualified to perform the blood draw.

3. The blood draw was conducted in a reasonable location.

4. A blood test was a reasonable means for law enforcement to ascertain the Defendant's blood alcohol level.

5. The Defendant's blood was drawn in a reasonable manner according to accepted medical practices.

6. David Miller, Daniel Romero, Jeffrey Williams, and Gannon Hurney were found to be credible witnesses.

Hildebrandt pleaded guilty to the third-degree felony offense of driving while intoxicated—third or more. *See* Tex. Penal Code §§ 49.04(a), .09(b). The trial court sentenced him, according to the plea agreement, to ten years' imprisonment, suspended the sentence, and placed him on community supervision for three years, with an order that he serve ten days in county jail as a condition of his community supervision. The trial court certified that he had the right to

8

appeal matters that "were raised by written motion filed and ruled on before trial and not withdrawn or waived." Hildebrandt appeals the denial of his motion to suppress.

**APPLICABLE LAW AND STANDARD OF REVIEW**

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "The touchstone of the Fourth Amendment is reasonableness." *State v. Villarreal*, 475 S.W.3d 784, 795 (Tex. Crim. App. 2014). "The drawing of a person's blood is a search under the Fourth Amendment." *Roop v. State*, 484 S.W.3d 594, 598 (Tex. App.—Austin 2016, pet. ref'd); *see also Schmerber v. California*, 384 U.S. 757, 769 (1966). A blood draw is reasonable under governing Fourth Amendment requirements if the police were justified in requiring the blood sample to be taken and if reasonable means and procedures were used in obtaining the blood sample. *Schmerber*, 384 U.S. at 768.

We review a trial court's ruling on a motion to suppress for an abuse of discretion. *See State v. Cortez*, 543 S.W.3d 198, 203 (Tex. Crim. App. 2018). We view the record in the "light most favorable to the trial court's conclusion and reverse the judgment only if it is outside the zone of reasonable disagreement." *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). Furthermore, we use a bifurcated standard, *see Roop*, 484 S.W.3d at 597, "giving almost total deference to the historical facts found by the trial court and analyzing de novo the trial court's application of the law," *State v. Cuong Phu Le*, 463 S.W.3d 872, 876 (Tex. Crim. App. 2015). We review video evidence in the light most favorable to the trial court's ruling. *State v. Fikes*, 585 S.W.3d 636, 640–41 (Tex. App.—Austin 2019, no pet.). However, we review "indisputable visual evidence" de novo. *State v. Duran*, 396 S.W.3d 563, 570 (Tex. Crim. App. 2013).

"When, as in this case, the trial court makes findings of fact, we determine whether the evidence, when viewed in the light most favorable to the court's ruling, supports those findings." *Abney v. State*, 394 S.W.3d 542, 548 (Tex. Crim. App. 2013). In addition, a trial court's ruling on the motion will be upheld if it is correct under any theory of law applicable to the case regardless of whether the trial court based its ruling on that theory, but "a trial court's ruling will not be reversed based on a legal theory that the complaining party did not present to it." *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014).

**DISCUSSION**

Hildebrandt contends that the trial court erred when it did not suppress the results of the blood draw. Hildebrandt does not challenge the validity of the warrant or the justification for requiring him to submit to the blood test. Rather, Hildebrandt contends that the means and procedures employed in taking his blood were unreasonable and, thus, violated his Fourth Amendment right to be free from unreasonable search and seizure. Specifically, Hildebrandt contends that his blood draw "departed significantly from accepted practices and standards of care" and "subjected [him] to an unjustified element of personal risk of infection or pain." He relies on *Schmerber v. California*, in which the Supreme Court stated:

> [T]he record shows that the test was performed in a reasonable manner. Petitioner's blood was taken by a physician in a hospital environment according to accepted medical practices. We are thus not presented with the serious questions which would arise if a search involving use of a medical technique, even of the most rudimentary sort, were made by other than medical personnel or in other than a medical environment—for example, if it were administered by police in the privacy of the stationhouse. To tolerate searches under these conditions might be to invite an unjustified element of personal risk of infection and pain.

10

> We thus conclude that the present record shows no violation of petitioner's right under the Fourth and Fourteenth Amendments to be free of unreasonable searches and seizures. It bears repeating, however, that we reach this judgment only on the facts of the present record. The integrity of an individual's person is a cherished value of our society. That we today hold that the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions.

*Schmerber*, 384 U.S. at 771–72.

Hildebrandt contends that, "[t]he Supreme Court deemed the blood draw in *Schmerber*—done at a hospital by a physician—reasonable, but stressed that tolerating blood draws under other circumstances might invite an 'unjustified element of personal risk of infection and pain' that would violate the Fourth Amendment." Here, the trial court found that the room used was a safe and sanitary place for a blood draw and that Miller followed accepted medical procedures for conducting an evidentiary blood draw. The record supports those findings. Miller testified that he was EMT Basic certified and had been a phlebotomist for the Sheriff's department for three years at the time of Hildebrandt's blood draw. He described the room used as the "Intoxilyzer room" where blood draws were also performed and that he followed the protocols and the accepted medical practices that he was trained on. The trial court found his testimony credible. The Court of Criminal Appeals has held that a blood draw was reasonably conducted when it was performed by a police officer that was a trained EMT in a dedicated blood draw room in the police station. *See State v. Johnston*, 336 S.W.3d 649, 662–63 (Tex. Crim. App. 2011) ("The environment here, according to the evidence in the record, was safe; it was in accordance with accepted medical practices and therefore did not 'invite an unjustified element of personal risk of infection or pain.'" (quoting *Schmerber*, 384 U.S. at 772)).

11

Hildebrandt contends that it was unreasonable to place him in the restraint chair "despite never displaying any physical resistance." However, in *Johnston*, the Court concluded that it was not unreasonable "to restrain a[n] uncooperative DWI suspect in order to obtain a blood sample." *Id.* at 663. The Court in *Johnston* "reject[ed] the notion that the mere use of force, without a finding of unreasonableness, supports the conclusion that the draw was performed in an unreasonable manner." *Id.* Hildebrandt attempts to distinguish the facts in *Johnston* to those in his case by pointing to the video evidence and testimony from the law enforcement witnesses that he was not violent or threatening during the process. However, the trial court's findings that he "explicitly told law enforcement that they would need to tie him down to get a sample" and that "[d]ue to [his] noncooperation, it was necessary for law enforcement to restrain [him] in order for the blood draw technician to take a sample," are supported by the record. Sergeant Romero testified that it was proper procedure to use the restraint chair for anyone who refused a blood draw. The video shows that Hildebrandt declined Miller's request that he stretch out his arm for the blood draw and stated that he would have to be tied down for Miller to take his blood even after being told that a warrant had been obtained. The arresting officer testified that Hildebrandt had been consistently "noncompliant" by refusing "any lawful order [he] gave." Further, the video shows that minimal force was used to lead Hildebrandt to the restraint chair and secure him in it.

Hildebrandt contends that it was unreasonable that he was not released from the chair once the arresting officer and deputies saw that Miller was having difficulty obtaining the blood draw and that Hildebrandt was not resisting. However, evidence was presented that Hildebrandt continued to be uncooperative throughout the blood draw. Miller testified that Hildebrandt was attempting to intimidate him during the process, Officer Hurney testified that Hildebrandt twisted and moved his arms to make it more difficult for Miller, and the video shows

12

that Hildebrandt refused to make a fist when Miller asked him to do so. Although Hildebrandt testified that he did not move around or do anything to make the blood draw more difficult, we defer to the trial court's credibility and fact determinations against Hildebrandt's telling of the events, which are not "contradicted by 'indisputable visual evidence.'" *See Duran*, 396 S.W.3d at 573 (giving "almost total deference" to trial court's fact finding that was not "contradicted by 'indisputable visual evidence'").

Hildebrandt complains that the footage from the handheld camera was lost, which he contends was the best view of the blood draw. To the extent that he is contending that the lost secondary footage rendered the blood draw unreasonable, we disagree. In *Johnston*, the defendant alleged that the blood draw was unreasonable in part because it was not recorded when recording equipment was available. *Johnston*, 336 S.W.3d at 663. The Court rejected that argument and explained that it could not "see how this supports an unreasonableness determination." *Id.* Rather the Court emphasized that the proper focus of the reasonableness inquiry is whether "these factors subjected [the defendant] to any additional risk of infection and pain above and beyond those normally associated with venipuncture blood draws." *Id.*

Hildebrandt contends that Miller was careless and incompetent in his administration of the blood draw. He points to the three recorded mentions of Miller's shaky hands as evidence of the unreasonableness of the blood draw. He contends that Miller's hand "shaking due to excessive caffeine consumption" prolonged the process, caused him painful bruising, and necessitated more than one attempt to draw his blood. He emphasizes the recorded moment when Miller told Officer Hurney that Hildebrandt's uncooperative behavior probably did not affect the outcome of the blood draw and stated that he "shook [him]self out of the vein." However, Officer Hurney testified that Hildebrandt was preventing Miller from putting the needle in his arm by twisting and moving it.

13

The trial court credited Officer Hurney's testimony in its finding that Hildebrandt twisted his arm during the blood draw, which is not "contradicted by 'indisputable visual evidence.'" *See Duran*, 396 S.W.3d at 573 (giving "almost total deference" to trial court's fact finding that was "not one that is contradicted by 'indisputable visual evidence'"). Further, Miller testified that he was on "high alert" while doing the blood draw because it was not typical to conduct them in a restraint chair, which changes the angle of the arm, and because of the concern that Hildebrandt would attempt to do something to prevent him from completing the blood draw. Additionally, Miller testified that bruising after a blood draw is common. Although there was no testimony regarding the reasonableness of attempting multiple blood draws, Miller testified, and the trial court found, that he followed accepted medical procedures for conducting a blood draw. The trial court resolved the conflicting explanations for the difficulties experienced by Hildebrandt during and after the blood draw in favor of concluding it was a reasonable search and seizure. Indeed, the trial court explicitly determined that all the witnesses, except Hildebrandt, were credible. *See Taylor v. State*, 604 S.W.2d 175, 177 (Tex. Crim. App. 1980) (explaining that "[t]he trial judge is the sole fact finder at a hearing on a motion to suppress and, as such, he may choose to believe or disbelieve any or all of the witnesses' testimony").

Hildebrandt also contends that Miller's lack of knowledge regarding how long a tourniquet may be safely administered demonstrates his "carelessness and incompetence." Although Miller testified that he did not know—and there was not a procedure regarding—the upper limit of time that a tourniquet may be safely left on, he also testified that he followed established medical practices during the blood draw. Further, there was no evidence presented about how long would be dangerous or that it was left on for a dangerous amount of time. *Cf. Fikes*, 585 S.W.3d at 642–43 (concluding that defendant "failed to show that his blood draw was an

14

unreasonable search and seizure that violated the Fourth Amendment, and the trial court abused its discretion in granting his motion to suppress" even though expert witness in phlebotomy training testified that phlebotomist violated standard procedures when no evidence was presented of likelihood of risk to defendant). Hildebrandt testified that he was concerned by the color of his hand. However, the video supports a reasonable inference that Miller, an experienced phlebotomist, was not concerned by the color of Hildebrandt's hand. Again, it was within the trial court's discretion to resolve any factual conflicts in the evidence. *See Taylor*, 604 S.W.2d at 177. Additionally, not all departures from accepted medical practices render blood draws unreasonable. *Siddiq v. State*, 502 S.W.3d 387, 400–03 (Tex. App.—Fort Worth 2016, no pet.) (concluding that blood draw was reasonable despite phlebotomist leaving tourniquet on for over one minute when she testified that she was trained not to leave it on for more than one minute).

Finally, Hildebrandt contends that Miller demonstrated a "lax attitude towards obtaining and handling forensic evidence" when he dismissed the mismatched dates on the blood draw kit's box and tubes and wrote matching dates on the paperwork contrary to his training. Although Miller testified that he was trained to check that the dates matched, he also testified that he followed the protocols and the accepted medical practices that he was trained on. It is unclear from the record what the proper procedure was in this situation. The trial court could have reasonably inferred that the reason for checking that the dates match was to ensure that the test kit was not expired. Although one of the dates was clearly an error because it does not exist, both dates showed an intent to display the last day in September, which had not yet occurred. Thus, the record supports that the kit was not past the expiration date. Further, Hildebrandt does not explain how Miller's writing the incorrect date subjected him to any additional risk of infection and pain above and beyond those normally associated with venipuncture blood draws. *See id.* at 397–98,

15

401–03 (explaining that not all departures from accepted medical practices render blood draws unreasonable and highlighting that Court's reasoning in *Schmerber* "focused on the effect of the intrusion upon the individual, not the reliability of the test results").

Based on the totality of the circumstances addressed above, we conclude that the blood draw in this case was not an unreasonable search and seizure under the Fourth Amendment. Thus, we conclude that the trial court did not abuse its discretion when it denied Hildebrandt's motion to suppress. We overrule Hildebrandt's sole issue.

## CONCLUSION

We affirm the trial court's judgment of conviction.

_____

Gisela D. Triana, Justice

Before Justices Triana, Theofanis, and Crump

Affirmed

Filed:   June 25, 2026

Do Not Publish

16